In 2004, the Greenbrier became a contributing employer to the Unite Here Health Taft-Hartley Trust Fund, and in doing so, it agreed to be bound by the trust agreement that governed that fund. The trust agreement, in turn, provides very explicitly that all contributions employers make are pooled together with all of the other contributions and become one trust fund to fund all of the benefits provided nationwide by Unite Here Health. And the trust agreement goes on to say, in language we quoted at page 10 of our main brief, no portion of the fund shall revert to or inure to the benefit of any employer or union, or to be used or diverted for purposes other than for the exclusive benefit of participants and beneficiaries except as permitted by ERISA. The trust agreement in this case answers the entirety of the question in this litigation because it explicitly and unambiguously prohibits the alienation of trust assets caused by the judgment below. The participants and beneficiaries that section 14.02 of the trust agreement are talking about are people who are covered by the fund, getting benefits from the fund. The assets of the fund may only be used to provide benefits through the fund to people covered by the fund. And what the district court did is take money out of the fund, transfer it to a separate entity to be used for providing benefits to people who are no longer covered by Unite Here Health. I would just run afoul of the anti-urine provision if the benefits are going to be placed in trust for the benefit of the Greenbrier Hotel employees. As I understand it, the management of the Greenbrier Hotel is not going to receive a single penny of this $5 million sum surplus. All of that is going to be held in trust and it's going to be used for the health benefits of the Greenbrier employees and also may be utilized to reduce their contributions. Now, if the Greenbrier or Sayer is not going to be enriched even one penny, how is the anti-urine provision implicated? In several ways, Your Honor. First, the anti-urine provision makes very clear that assets of the trust can only be used for the exclusive benefits of participants and beneficiaries. Participants and beneficiaries, in turn, are defined as people receiving benefits from the welfare fund, from Unite Here Health. This is pretty common. It's a fundamental principle of ERISA that if you have a trust that is holding assets of a plan, you may not use those assets for providing benefits or for doing anything other than providing for the benefits, the well-being, the benefits of the people who are participants and beneficiaries in that particular fund. Secondly, once this group, Plan 155 or whatever it is, withdraws from the fund, it's as if they never had any connection with it. I mean, they were participants. And if the plan of the terms of the fund and the terms of the plan provide for distribution of surplus funds to them, why wouldn't their status as, their formal status as participants, plus a provision for distribution to participants under the terms of the fund, I'm not sure how that runs afoul of the prohibition on non-participants participating, because he seems to be in a functional, realistic sense. The Green-Briar employees seem to be participants. Well, this is, it's important, Your Honor, to consider the context of this entire arrangement. This was a multi-employer welfare fund. It covers 200,000 people nationwide, different employers around the country. But this one, this plan was a single-employer plan, correct? This was, so, I think the use of the word plan has caused some confusion here. It is used sort of haphazardly, but in this particular funding unit, this is, Green-Briar negotiated a single-employer funded thing. That was rather its concern in the point of how it was structured, as I understand it. I think that the concern that the Green-Briar had, and there was a lot of testimony on this, is really beside the point, because the trust agreement is very... Could you just answer my question, though? It was in part an actual question. You were saying that we needed to understand that this was a multiple-employer entity that sprawled across the country, and my question to you went to that point, that this is not, in fact, what we're talking about here, is it? That's all I'm asking, just a factual point. No, that's not correct, Your Honor. This is a, Unite Here Health is a single, multi-employer trust fund under the Taft-Hartley Act and ERISA. It is one, it constitutes one single ERISA plan. The plan units are schedules of benefits that are provided to different groups of employees in different areas of the country, and that is all the plan unit 155 was. If you look at the definition of a plan unit... It's for underwriting purposes, basically. It's for underwriting purposes, and because the benefit levels in West Virginia are going to be different than the benefit levels in Las Vegas or New York or Chicago. I think that, it seems like to me the question to answer here is not with the anti-injuryment provision, because to me that seems to be a weak argument. But the question to answer is, based on the trust agreement, why is the Greenbrier's argument invalid? In fact, it seems like to me they argue in the district court held that the plan rules for this individual Greenbrier account, in effect, amended the trust to permit a distribution on severance from the multi-employer claim. It seems like to me that's where the argument is most clearly focused, is why does the trust agreement invalidate that argument? Does that make sense? It does, Your Honor. And it invalidates that because the trust agreement, the language that the district court focused on in the plan rules and the summary plan description is contained within documents that make clear that they are governed ultimately by what the trust agreement says. And the trust agreement says, money goes into this fund, it's pooled with every other contribution and source of income, and is spread out to provide benefits for everybody else in the fund. The language, and then there's the anti-injuryment language in there that says you don't get, employers don't get money back out of this fund. There's nothing in the context of the trust agreement or multi-employer funds that, as Justice Stevens explained in the Demise decision in his concurrence, and the Second Circuit explained in the Caterina v. Berry case, there's nothing in the context of a multi-employer fund that supports this idea that when an employer leaves, it gets to get a rebate on contributions or some chunk of the assets. I don't think that, you know, I think I'm following up on a point Judge Duncan made, but maybe not. I don't know. But looking at this, looking at these plans, there's nothing to prevent you or any plan, and I imagine that these are a standard feature of most multi-employer plans, which would be to draft plan language saying that all contributions remain property of the fund upon termination of plan units within the fund. Now, that wasn't in there, was it? So you could, in other words, it's still contractual anyway. It was a matter of negotiation, open to you to resolve, to set up exactly what you're talking about. And we believe that we did, Your Honor. The trust agreement doesn't have language saying specifically what you said. Which is why, to follow up, and this was going to my question, which I may not have been able to answer, but if the trust doesn't make that provision, it's hard to say that the plan rules and regulations are in conflict when, and leave aside the summary plan description, just leave that out of the equation, because I don't, that's not my mission, but the rules and regulations provide that if the plan is terminated, excess assets would be used for purposes consistent with the purposes of the plan as determined by the trustees, or they would be terminated, which would seem to be pretty consistent with the point of plan 165 in the first place. And precisely because the trust agreement doesn't speak to it, I don't see the conflict. And that, in a nutshell, is the difficulty I'm having, and could use some help with. Let me try, Your Honor. The trust agreement creates a single ERISA plan, and a single pool of assets, and the concept that the district court relied on and the plaintiffs have relied on was that there was a separate pool of assets and effectively a separate ERISA plan for the folks at the Greenbrier, and that is not factually correct. Well, there was a plan. There was a plan 155 that was created solely to serve Greenbrier employees. There is a document that is called Plan Unit 155 Rules and Regulations, but if you look at the trust agreement and the definition of plan unit, what it says in the trust agreement is that a plan unit is simply a schedule of benefits. The trust agreement also defines something called the welfare plan, and explains that the trust fund, the entirety of the fund, is used to pay benefits provided under this welfare fund, which is a single ERISA plan for everyone nationwide in UnitedHealth. The argument was, as you say, why was it necessary for you to make this 11th hour amendment, which gave the fund trustees plenary authority over the distribution of surplus assets? In other words, that 11th hour amendment was the cure for the lacunae in the plan that the panel has expressed its concern about. And if you already felt like you had that authority under the terms of the plan, there would have been no need for this 11th hour amendment, where you unilaterally voted to invest yourself with this plenary authority under circumstances that required the district court to raise an eyebrow, to say the very least. The need for the amendment underscores the absence of authority prior to the amendment. Well, two points, Your Honor. One, the amendment may, as you say, may not have been, strictly speaking, necessary. I mean, I think the trust agreement answered the question. Well, because as the record of trial suggested, the Greenbrier had raised questions about this language, and the trustees retained the absolute authority to amend these rules to clarify their intention all along. It wasn't just a precautionary step. Judge Berger found that this was done as an act of retribution, because the Greenbrier employees had voted to take Plan 155 out of the United Health and have Sadie be their bargaining agent. And so you're posturing this amendment as simply a precautionary response to some questions that the Greenbrier raised, but that's not the way that the trial judge, after a six-day bench trial, saw it. She used the terms unreasonable, discriminatory, in bad faith, and made in violation of the plan's amendment procedures, which is pretty much of an exclamation point. And that is wrong because? It's wrong because, first of all, there was no violation of the plan's amendment procedure. But you're telling me you disagree. Well, I do disagree, Your Honor. And I disagree because, first of all, factually, there was no violation of the plan's amendment procedure. The plan rules specify that the trustees may amend at any time. They did. This amendment applied uniformly to everybody in Plan Unit 155. The testimony from the trust, Mr. Wilhelm, who was the president of the Board of Trustees, was that the fund has never given assets to a departing employer under these circumstances. It was never their intention to permit that, because that's, in fact, what Section 14.02 prohibits. And so this amendment to the plan rules, the record doesn't, the language as to the amended rule, because that was, the record doesn't answer the question of where this language originally came from. These rules were, the rules that applied essentially were the template applicable to every plan unit in the fund. And the issue arose here. The trustees were made aware that there was a contention that the Greenbrier was entitled to excess assets upon its departure, and corrected that by expressly stating in the amendment their position on this issue. And they exercised their discretion in doing that, and the Court erred as well in not deferring to that exercise of discretion. Thank you, sir. Thank you. Ms. Palmer, let's hear from you. To please the Court, Kimberly Palmer for the Greenbrier and the individual participants in Plan 155. I think the initial problem with the fund's argument is that they say that the district court relied on a concept rather than on the facts. That's why the Greenbrier has standing. Why the Greenbrier has standing? The Greenbrier, by signing on to the trust agreement, was appointing the trustees for all intents and purposes, according to the language of the trust agreement. They were ratifying actions taken by the trustees. How did they do that? The trust agreement says that they do by signing on. They're ratifying actions taken by the trustees in furtherance of their fiduciary duties. And I think most importantly in this case, the Greenbrier was to accept not only their own contributions to the fund, but they were to take employee contributions, submit them to the fund, and they had the obligation under the trust agreement to monitor their employee roles and make sure that the benefits were being used correctly. How does that make them a risk fiduciary? I think this court in Phelps has said that by the fact that they accepted employee funds, disregarding their own funds for the moment, the fact they accepted those employee funds to contribute to the fund, they had an obligation to make sure that those funds were used for the purposes for which they were intended by the employees and by themselves. Those are payments that are made in lieu of paying the employees' wages. So I think they clearly had an obligation. How does that differentiate them from any other employer? Every employer doesn't get to be a risk fiduciary for standing purposes just because they transmit money to the client. Well, I think it depends upon, in large part, as the cases speak to, what the employer is trying to afford in bringing the claim. Here it is clear the Greenbrier is not bringing claims to enforce some right on behalf of itself as an employer. The Greenbrier was simply bringing claims to enforce the rights of its union employees under that trust fund and the rules that pertain to it. If the Greenbrier did not, who would bring an action? Who would be the appropriate party? I'm not arguing. I'm really asking factually. Who other than the Greenbrier could bring such an action? The participants themselves, as they did. As they did? Yes. So I think, you know... So does it ultimately, if the Greenbrier doesn't have standing, does it matter for purposes of the action? I'm really just asking. I think it does not matter. Because of the presence of the... The participants themselves have standing. And whether or not the Greenbrier is found to be a fiduciary with standing really doesn't change the opinion. The analysis? Correct. Is this drafted in the way that most multi-employer plans are drafted? I was under the impression that as a... That surplus funds, based upon withdrawal, would generally revert to the fund. And that the whole purpose, I guess, of a multi-employer fund was that everybody gave up a little bit for the benefit of all. It works much as an insurance policy. And so I was a little bit surprised to see this because it seemed to me that it might be a little bit different from the way most multi-employer plans work, which is to have a reversion to the fund if there's surplus funds with some withdrawal. Would you speak to that? Sure, certainly. I think, first and foremost, there is authority for the fact that not all plans are drafted such that funds revert back to the trust fund upon an employer's leaving. But this particular plan was drafted with very clear concerns of the Greenbrier in mind. The Greenbrier did not enter into one of the plan units. Plan 155? The plan unit itself was designed. When the Greenbrier entered into the fund, the fund had existing plan units. I think there's a Las Vegas plan unit. Just various units that cover multiple employers in different areas of the country. Did all the plans have the same right that you claim as plan 155? Did they have language in the plan rules about excess assets used upon plan termination? I do not know. If they did, they would not have the same effect or application as in this particular instance. The Greenbrier... Because this is a single employer plan unit? Correct. I mean, they try to... All units in a multi-employer plan are single employer units in one way or the other. They're differentiated for underwriting purposes. That's exactly what your participation agreement says this is. In this particular fund, the Greenbrier plan unit is the only plan unit that has a single employer. All of the others have multiple employers, hundreds of employers, in each plan unit. And the underwriting is conducted on a plan unit basis, not an employer basis. Okay. And the Greenbrier was very clear. Does that help you... Tell us what about this unit 155 plan allows it to carve out from the trust agreement a disposition of assets when the 155 unit isn't there? Well, the terms of the plan documents themselves and the fact... I think it's important. The plan unit rules. And I think it's important to understand that the Greenbrier did not agree to enter into one of the pre-existing plan units that the fund had at that time. It varies specifically by the terms of the participation agreement and the rules themselves sets out that the Greenbrier said, no, we want our own plan unit. And they designed a plan unit for that. Your best evidence of a differentiation in terms of the trust multiplayer trust agreement is the unit 155 plan. I think the rules have to be read with the trust agreement. The trust agreement does not prescribe any provisions for how benefits were paid or with respect to other plan units. Or what happens if there is a plan termination? That's what led to the amendment. Correct. What happens... The last minute amendment. So is the unit 155 plan rules, is that a contract with the trust or an amendment to the trust? I think it's neither. I think it is one of the governing plan documents and they have to be read together. The trust agreement by itself could not possibly be the only authoritative document. Go back to this basic question. Prior to the amendment, where in the plan documents or regulations does plan 155 derive the right to have surplus funds distributed to yield? It's very clearly in the plan rules in the amendment and termination provision. I believe it's article 19. I'll read that to you. The plan rules themselves state very clearly that if it should happen, that the plan is terminated. Benefits for a covered expense incurred before the termination date will be paid as long as the plan's assets are more than the plan's liabilities. This is the plan defined in this document, this very document defined as plan 155. Full benefits may not be paid if the plan's liabilities are more than its assets. If there are any excess assets remaining after the payment of all plan liabilities, those assets will be used for purposes consistent with the purposes of the plan or may be transferred to another employee benefit fund providing similar benefits. That's what makes 155 different because in the other plan units, there are multiple employers sharing profits or excess, etc. It leaves other employers. This plan unit only has one employer. You're only looking at net and excess with respect to one employer. Yes. In this particular case, it sort of puts a very distinct difference to their argument that we're going to have employers leaving and taking assets with them. The language you lean on is what? Purposes of the plan? If there's money left over, it may be used in a manner consistent with the purposes of the plan or transferred to another employee benefit fund providing similar benefits. Is that the crucial language in your view? Purposes of the plan? I believe it is. Well, that and the or transferred. As Judge Berger found, even when they changed the language and said it could be used with purposes consistent with purposes of the trust agreement, that doesn't conflict with that language. But when you say purposes of the plan, the plan there is meant to refer to Plan 155. It is. And it's defined as such. Right. So when we're talking about the fund as a whole, is the term fund used? When we're talking about Plan 155 in particular, is the term plan used? That is the way that the rules define plan and fund, and they define both terms. So given those, I want to just draw this out because I think, you know, there's a lot of stuff floating around here. I want to get down to what I think is the critical thing, which is the language in the plan document that gives you the right to the surplus funds. And your view is that once liabilities have been paid, once the claims have been paid, if there's any excess left open, that those will be used for the purposes of the plan. And the purposes of the plan were to provide for the health benefits of those Greenbrier employees. Absolutely. And that's, you know, that's kind of the nub of it. There are lots of issues, lots of questions, but that's what the trustees and the fund was very nervous about. Apparently. And that's what precipitated the amendment. I think that it was very clear, and the district court found the same, that the chairman of the fund himself said, well, I guess the amendment was made because we were worried  And in-house counsel told Ms. Vance, an employee of the Greenbrier, actually, she was an employee of the fund at the time, I believe, told her very clearly, if that's what those plan rules say, then the trustees will have to make an amendment because you can't have the excess assets. I mean, they very clearly thought that they had to. What else other than this termination provision of 155 does this concept appear? The concept of the excess assets? Correct. It appears in the summary plan description, which is what is provided to the participants and was not amended in this particular case. Well, there wouldn't have been a need to, I guess, if the trustees disagreed with the interpretation of the plan rule. I was curious as to why this never came up in the participation agreement. Because that goes to great lengths to talk about run-in plans, run-out plans, talks about 155 as an underwriting unit, and there's no mention anywhere in the participation agreement about an entitlement to assets on leaving the agreement. Well, I think that the participation agreement was drafted in such a way and in such a circumstance that that was the clear understanding of the Greenbrier and everyone else. I mean, the fund had described to the Greenbrier how it was. Does that agree? Does the participation plan speak to the termination of the plan? It does not. Okay. And, you know, the participation agreement was designed intending – they didn't intend to leave the plan. They didn't intend to leave the plan when they actually did leave the plan. The fund had described how the fund worked, and the Greenbrier said, well, you know, I don't know if our best interests are served by being lumped together with a bunch of hotels in Las Vegas. If we're going to come into the fund, we want our own plan. They didn't anticipate leaving. That was a condition of joining the fund. Pardon? That was a condition of joining the fund. It was. I mean, they testified – the CEO at the time testified at trial that if that provision had not been in there, had they not been segregated as their own plan unit, the Greenbrier would not have joined the fund because it didn't – There was evidence at trial which apparently the district court rejected that indicated that a $5 million figure substantial part of that if not all of it was represented by reserve commitment and earnings on investments and not surplus assets. Why is that argument not correct? I think for several reasons. And I do not think that the district court rejected necessarily the evidence at trial with respect to the reserve and the reserve policy. I think she found it just simply was irrelevant to this particular discussion. You know, the language that's relied on does not talk about carving out reserve. Because the calculation of this $5 million figure was made up of those two items. That would seem to be the outliers. But there's nothing that says in those documents that the reserve is to be taken out of the excess assets before they're used for the purposes of the Greenbrier employees. And the evidence at trial showed that the fund is set up in such a way that the reserves are specifically calculated with respect to individual plan units. And very particularly calculated, taking into account their rates and their expected trends in the cost of the benefits. Oh, sorry. No, finish. So, but by terminating the plan 155, there's no longer any need for the fund to keep those reserves. And in fact, keeping those reserves would actually make employee contributions from employees of the Greenbrier, and you're to the benefit of the employers that are still in the fund. Because now they've got a reserve much, much larger and a much better reserve position than they'd ever had before. Has the, it was my recollection that appellees have never quantified, have never acknowledged that there is an excess, or didn't the district court was pretty pointed about that? There were multiple sort of contortions of their contention that there were no excess assets. I think in the beginning they said they didn't know what excess assets were, despite the fact that that's in their own documents. And they said that it didn't have any meaning at all. And finally they said that there weren't any, but they never produced anything other than the documents that the district court based her decisions on. Those are the only documents they ever produced. They didn't even produce, I think it was Mr. Simon, who testified at trial about the reserves and what the reserve component would have been. He was not even the underwriter who was underwriting the Green Bar Plan. He produced, as district court found, no evidence of how he got to the calculation that the amount of the reserve within that excess assets was what he said it was. And in fact, if you look closely at the documents that were produced and placed into evidence of underwriting at the time, he was guessing. I think he said he assumed a 5% trend. I think the documents at trial showed that the Green Bar Plan was not assessed a trend at all for the first year. And I think maybe in the second year they were assessed a 2% trend for the purposes of underwriting. So even the evidence that Mr. Simon gave as to what the reserve component was isn't the actual reserve component. It wasn't ever, and he gave no substantive evidence of that fact. Help me understand the effect of a determination either way on the plan participants. If we agree with you, or if we agree with UNITE HERE, how UNITE HERE, if we agree that UNITE HERE is entitled to retain these reserves, what is the effect on the Green Briar Plan participants? And if they are allowed to take the plan reserves, what is the effect practically on the Green Briar participants? If you follow up. The plan participants, if entitled to have those funds transferred, will get the benefit of their employee contracts with the Green Briars paid out. Those funds are already there. 20% of those funds belong to the employees already. If they're transferred to a fund, they will go into the fund. The fund is structured such that they will be used to pay benefits and actually pay benefits without any contributions from the employees until those funds are exhausted. So the participants in that sense... Is that function of the flow-in, flow-out plan that the plan rules and regulations are calculating at the end of every period, liabilities and true-ups? Do you follow my question? I think. Is that what they were... Is that part of what gets looked at when you're looking at whether or not there are reserves? If the fund expenses are being covered by the funds paid? Right. That is exactly what they use those reports for. They use those reports to track and tell the trustees the amount of contributions received for each plan unit, the amount of expenses and benefits for each plan unit, the administrative expenses for each plan unit. They even detail gains and losses and investments for each plan unit. At the end of the day, there's a clear surplus or deficit. That's what they use to base rates on the next time. That's what they use to base the reserve components on the next time. It isn't a difficult sense. They testify themselves that they use those reports. They're accurate. They rely on them. They can't say now that somehow that's an incorrect representation of what the assets are. I just wanted to have a... I'm just trying to make sure that to the best extent... As best I can, I understand how it works. Sure. Thank you. Thank you. When the Greenbrier joined the fund, it signed the participation agreement. The participation agreement does speak to what happens if plan unit 155 or the Greenbrier's participation is terminated. What it says is that at that moment, there will be no further benefits paid. This is because what essentially happened here was the reverse of the normal deal. The fund agreed to pay, quote-unquote, run-in claims, so claims incurred under the Greenbrier's prior self-insured plan. And in exchange, had no liability after the termination date. So the participation agreement does speak to that. The other thing that I think has been glossed over here is the fact that this participation agreement and this arrangement whereby the Greenbrier came in to Unite Here Health was the product of negotiations where the record was that the individuals who worked on this had decades, if not probably cumulative centuries of labor management experience. It does not say anywhere in the documents that were agreed to the participation agreement, the collective bargaining agreement, or the trust agreement. The documents that were agreed upon when the Greenbrier came in never say they get a refund. In fact, what the evidence was was the Greenbrier was under a self-insured arrangement before, was taking a bath because its costs were escalating at a rapid rate, and it was looking for an insured arrangement. That's what the fund provided. And this case is just like an insurance contract where you pay your premiums, the insurer pays the claims, and at the end, you're done. Where does it say in the surplus funds you're going to revert to the fund? It says that in the trust agreement, which the Greenbrier agreed to be bound by. That participation agreement and the collective bargaining agreement, which were the things that were bargained and agreed to, say explicitly and repeatedly that they're bound by the trust agreement, which says there's no reversion. It says there's pooling of assets, so every dollar that goes in is mixed up with everybody else. It requires the reserve. The reserve policy is mentioned specifically in the participation agreement on the very page, top of the page where Mr. Kleisner signed it, and they claim they didn't know what this reserve policy was, and that's not true. He signed right on the page, very top, it says, bound by the reserve policy of the welfare fund. The reserve policy benefited the Greenbrier in the first year to the tune of a million dollars. Their contributions did not cover the costs that the fund absorbed in that first year. If this was truly separate, like they contend, they would have had to pay an extra million dollars. They did not. Instead, the fund carried them through that first year, and this happened again during the downturn. I think that doesn't recognize the significance of the termination. The participation agreement simply says that when, as you presented, you don't pay any more in and you don't take any more out. That doesn't say anything about what is already in there, and that's the nub of what we're talking about. Now, that's what the plan rules and regulations go to. I'm not sure that the participation agreement provision, as you presented to us, carries much weight for you. I think, Your Honor, respectfully, the documents that were signed, the participation agreement, first there was a memorandum of understanding signed between the parties. Attached to it were the minimum standards of the welfare fund and the trust agreement. The participation agreement incorporates the trust agreement and Mr. Gittin's rate-setting memo. The evidence was that the plan rules were adopted by the trustees after the fact, after the parties had agreed upon the terms, and the terms only spoke to the trust agreement. And the Greenbrier agreed it was bound by the actions of the trustees and bound by the trust agreement. And the trust agreement says, you simply cannot get around the language in the trust agreement that says the assets are pooled, this is a single fund, and you don't get any money back. And the trust agreement also says in section 1.07 and 1.08, speaks about what plan units are. And plan unit is defined in 1.08 as the benefit programs adopted by the trustees for specific regions of the country. Each plan unit shall be considered part of the welfare fund and the welfare plan administered here under. The welfare fund is this trust fund that we're talking about. That's defined in 1.06. And 1.07 is the definition of welfare plan, which is an employee welfare benefit plan, a single one administered by these trustees. That's what the Greenbrier agreed to buy into. It agreed to buy into this pooled arrangement because that was what made sense to it at the time. And now it's trying to get a deal that it never had, contrary to the trust agreement. Secondly, the action that's at issue is the trustees' interpretation of all these documents. There is no question in this case that the trustees had complete authority to interpret the documents and say what they meant. They, like the trustees of the fund at issue in the Caterino case, had adopted effectively a no-transfer policy. That's what's set forth in the trust agreement in 14.02. That's what Mr. Wilhelm testified to, which we never transferred assets. There have been many... ... ... ... ... They do because they speak to the ...
judges: J. Harvie Wilkinson III, Allyson K. Duncan, G. Steven Agee